# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**PAUL A. BOCHAT,**

              **Plaintiff,**

    **v.**                            **Case No. 15-C-34**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
              **Defendant.**

---

## DECISION AND ORDER

Plaintiff Paul Bochat applied for social security disability benefits, claiming that he could no longer work due to Crohn's disease, inflammatory arthritis, and depression. The Social Security Administration ("SSA") denied his application, and plaintiff now seeks judicial review.

## I. FACTS AND BACKGROUND

For nearly 20 years, plaintiff worked steadily as a machine operator and packer, despite his Crohn's diagnosis. (Tr. at 218-19, 224, 239, 407.) In 2007, he began missing a significant amount of work due to his symptoms (Tr. at 303-04, 305-36, 590-673), eventually exhausting his FMLA time, resulting in the termination of his employment in September 2011 (Tr. 64, 334-36). The following month, he applied for disability benefits, alleging a disability onset date of August 18, 2011.[1] (Tr. at 53, 211, 234.)

In support of the application, plaintiff submitted a report from Dr. John Linscott, his long-time primary care physician. Dr. Linscott listed diagnoses of rheumatoid arthritis, Crohn's disease, and depression, with associated symptoms of bloody diarrhea, abdominal pain and

---

[1]Plaintiff's last day of work was August 17, 2011. (Tr. at 334.)

cramping, loss of appetite, fistulas, nausea, peripheral arthritis, and fatigue. He further indicated that plaintiff experienced chronic, wide-spread joint pain, mild to moderate 50% of the time and severe 50% of the time. He indicated that stress precipitated episodes of severe pain, rendering plaintiff unable to work. (Tr. at 531.) He also identified psychological conditions affecting plaintiff's physical condition, including depression and anxiety (situational, like in the workplace). He opined that plaintiff could continuously walk one to two city blocks, sit 20-30 minutes, and stand 20 to 30 minutes; in an eight-hour day, plaintiff could sit about two hours and stand/walk about two hours. (Tr. at 532.) Plaintiff also needed a job that allowed shifting positions at will due to his rectal fistulas, ready access to a bathroom, and unscheduled bathroom breaks every one to two hours lasting 15 minutes. (Tr. at 532-33.) Plaintiff would likely be off task 10% of the workday due to his symptoms. Finally, Dr. Linscott indicated that plaintiff's impairments would produce good and bad days and about four absences from work per month. (Tr. at 533.)

Plaintiff also submitted a report from Dr. Paul Harris, his treating psychiatrist, listing a diagnosis of major depressive disorder with psychotic features, including chronic auditory hallucinations, and clinical findings of sadness, reduced concentration, and insomnia. Dr. Harris also noted that plaintiff had been hospitalized from August 21 to 24, 2012, for psychotic depression and suicidal ideation. (Tr. at 542.) Regarding the mental abilities needed to do unskilled work, Dr. Harris found plaintiff "unable to meet competitive standards" in the areas of maintaining attention for a two hour segment, maintaining regular attendance and punctuality, sustaining a routine without special supervision, completing a normal workday without interruptions from psychologically based symptoms, performing at a consistent pace, and dealing with normal work stress. He found plaintiff "seriously limited" in his ability to

2

remember work procedures, understand and remember short and simple instructions, carry out short and simple instructions, work in coordination with others without distraction, make simple work-related decisions, accept instructions and respond appropriately to criticism, and respond appropriately to change. (Tr. at 544.) Dr. Harris also found that plaintiff would be absent from work more than four days per month due to his impairments. (Tr. at 546.)

In denying plaintiff's application at the initial and reconsideration levels, the SSA relied on state agency consultant opinions that plaintiff could, despite his severe mental impairments (which produced moderate limitations in attention, concentration, and public interaction), perform simple, routine tasks. (Tr. at 113, 116-17, 131-32.) The consultants further opined that plaintiff could, despite his severe physical impairments, perform light work with occasional postural movements. (Tr. at 114-15, 129-31.)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 152.) At the hearing, plaintiff testified that he was 45 years old, 5'7" tall, 310 pounds, and lived with his parents. (Tr. at 57-58.) He reported that he lost his job as a machine operator and line worker after missing too much work due to back pain and Crohn's flare-ups. (Tr. at 59-63, 67-68.) Plaintiff testified that during a flare-up he experienced fatigue, cramping, pain, diarrhea, and chills, and had to go to the bathroom seven to ten times per day for 10 to 15 minutes. (Tr. at 68-69.) These flare-ups lasted three to five days, triggered by work stress and weather changes. (Tr. at 70-71.)

Plaintiff testified that he also experienced chronic pain in his back, hands, shoulders, and knees related to rheumatoid arthritis. (Tr. at 73.) He indicated that he could wash dishes for about 15 minutes before he had to take a 15 minute break. He also had to stop after about 10-15 minutes of typing on the computer. (Tr. at 74.) He mowed the lawn once or twice per

3

month, sitting down after about 15 minutes due to pain. (Tr. at 80.) Regarding his mental symptoms, plaintiff testified that he continued to experience auditory hallucinations, which interfered with his sleep, requiring naps during the day. (Tr. at 75-76.) During a 24-hour day, he spent about 18 hours in his room, watching TV, playing on the computer, and reading. (Tr. at 76.)

Plaintiff testified that on a good day, he did not have to go to the bathroom a lot and his bottom and back hurt less. On a bad day, he would go to the bathroom constantly, depression would kick in, and he would have a lot of pain on the right side. (Tr. at 80.) Laying down was the only way to relieve the pain. (Tr. at 80-81.) Plaintiff indicated that in a month he would have 25 bad days. On those days, he would accomplish nothing. (Tr. at 81.) He left home at least once per week to go to the grocery store, but he would be in and out quickly (within 15 minutes). (Tr. at 81.) When he left home he carried extra bandages to capture discharge but not a spare change of clothes. (Tr. at 82.)

Plaintiff's father testified that during flare-ups he could see the pain in his son's face. "He would be pale. He would be holding his side. He'd be going to the bathroom quite a bit." (Tr. at 84-85.) Plaintiff's father further testified that, when he was working, plaintiff felt poorly 15-23 days out of the month. He would fill his lunch box with four by four gauze pads, using those during the day because he was bleeding so much. (Tr. at 85.) Plaintiff's father also indicated that plaintiff did not cope with stress or changes in routine very well and had a hard time making decisions and maintaining concentration. (Tr. at 85-87.) Plaintiff had to be reminded to do household chores like taking out the garbage and recyclables; he did dishes every three to four days, and it took him two plus hours to finish, taking frequent breaks. (Tr. at 88.) He last mowed the lawn five weeks before the hearing, and it took him all day to do it.

4

When he would snow-blow the alley, his hands would swell. He did not socialize with friends; they had given up on him because he did not go anywhere. (Tr. at 89.)

The ALJ also summoned a vocational expert ("VE") to the hearing, and she classified plaintiff's past employment as medium, unskilled work. (Tr. at 96.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, capable of lifting and carrying up to 20 pounds occasionally, 10 pounds frequently; standing and walking six hours collectively and sitting for six hours in an eight-hour workday; occasionally climbing ramps and stairs, balancing, crouching, kneeling, and crawling; needing to avoid more than occasional exposure to extremes in temperature and humidity, as well as hazards; and further limited to routine tasks that allowed for being off task up to 10% of the workday in addition to regular breaks, did not require fact-paced production, and involved no more than occasional interaction with the public. (Tr. at 96-97.) The VE testified that such a person could not do plaintiff's past work, performed at the medium level, but could do other jobs such as food preparer, assembler, and order filler. (Tr. at 97.) Adding a further limitation of occasional handling and fingering with the left hand would eliminate the food preparation and assembly jobs, but the order filler job would remain; the person could also work as a mail clerk and machine tender. (Tr. at 97-98.) If the person also required a sit/stand option at will, the order filler job could not be done, but the mail clerk and machine tender jobs would remain. However, if the person required five to six unscheduled breaks lasting up to 10 minutes, he could not perform those jobs or any other unskilled work. (Tr. at 98.) The VE said that employers would tolerate one to two absences per month. (Tr. at 100.)[2]

_____

[2]The VE stated that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), but noted that the DOT refers to handling and fingering with one or both hands;

5

The ALJ issued an unfavorable decision. (Tr. at 18.) Following the familiar five-step sequential evaluation process, see 20 C.F.R. § 404.1520(a)(4), the ALJ first determined that plaintiff had not worked since August 18, 2011, the alleged disability onset date. At step two, the ALJ found that plaintiff suffered from the severe impairments of inflammatory bowel disease ("IBD")/Crohn's disease, anal fissures, inflammatory arthritis, obesity, and affective disorder. (Tr. at 23.) At step three, the ALJ concluded that none of these impairments qualified as conclusively disabling under the agency's Listings. In evaluating the mental impairment Listings, the ALJ found that plaintiff experienced mild restriction of activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 24.)

The ALJ next determined that plaintiff retained the residual functional capacity ("RFC") to perform a range of light work, alternating between sitting and standing as needed; occasionally climbing ramps and stairs, occasional handling and fingering with the left hand, and occasionally balancing, crouching, kneeling, and crawling; avoiding more than occasional exposures to hazards and extremes of temperature and humidity; and limited to routine tasks allowing him to be off-task up to 10% of the workday in addition to regular breaks, no fast-paced production, and no more than occasional interaction with the public. In making this finding, the ALJ considered the credibility of plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 25.)

Regarding plaintiff's symptoms, the ALJ concluded: "The claimant's testimony concerning the presence of incapacitating discomfort and associated functional limitations is

_____

it is not specific to one. (Tr. at 99.)

only partially credible." (Tr. at 31.) In support, the ALJ pointed to "several inconsistencies that negatively impact the claimant's overall credibility." (Tr. at 31.) The ALJ noted that while plaintiff testified to disabling IBD symptoms, he "did not initially even mention IBD as a severe impairment." (Tr. at 31.) And, while plaintiff alleged a need for frequent bathroom breaks, he did "not carry a change of clothing with him when he leaves home." (Tr. at 31.) The ALJ also found that the medical evidence did not support debilitating gastrointestinal symptoms but instead indicated that plaintiff's symptoms were well managed with medication. (Tr. at 31-32.) Finally, the ALJ noted plaintiff's daily activities, including laundry, dishes, vacuuming, taking his dogs for short walks, preparing simple meals, playing on the computer, reading, mowing the lawn or doing dishes with breaks, and going to the grocery store once per week. Plaintiff's father testified to these activities plus snow blowing (with breaks) and taking out the garbage, and a June 2013 treatment note indicated plaintiff was "active" around the house. (Tr. at 32.)

The ALJ then turned to the opinion evidence, finding that the state agency consultants' opinions supported a finding of not disabled. The ALJ found that although the consultants were non-examining physicians, their opinions deserved some weight, particularly where there were a number of other reasons to reach a similar conclusion. (Tr. at 32.) The ALJ did conclude that additional evidence received at the hearing level supported further limitations, including some handling and fingering limitations with the left hand. (Tr. at 32-33.)

Regarding Dr. Linscott's opinion, the ALJ concluded:

This opinion is not given significant weight. First, such restrictive limitations are inconsistent with Dr. Linscott's own treatment notes from that very day where the claimant denied pain, nausea, vomiting, diarrhea, changes in or problems with bowel habits or blood in his stool and denied any joint pain, muscle pain or swelling. Such restrictions are also inconsistent with the relatively normal physical examination of the claimant that day, with an unremarkable abdominal exam, normal musculoskeletal exam, with normal muscle tone, reflexes and

7

coordination, and normal mental status. Moreover, prior to the appointment at which he completed that form, Dr. Linscott had not seen the claimant for nearly 10 months, since February 1, 2012.

(Tr. at 33, internal record citations omitted.)

Regarding Dr. Harris's report, the ALJ stated:

This opinion is not entitled to significant weight; again, these restrictions are inconsistent with Dr. Harris's own treatment notes from that very day, where the claimant reported his mood was "ok" and he was only experiencing an occasional auditory hallucination, and mental status exam showed the claimant was neat, fully oriented, with normal speech, goal-directed thought processes and good insight and judgment. In addition, at the time of the appointment when Dr. Harris completed this form, he had not seen the claimant in nearly three months, since October 24, 2012. Moreover, these conclusions are inconsistent with other treatment notes after his August 2012 hospitalization. Immediate post-hospitalization follow-up was positive, with the claimant reporting good mood and no more auditory hallucinations. In late October 2012, the claimant said his mood was "pretty good" with no suicidal ideation, and no auditory hallucinations and less than two weeks later, the claimant was neither anxious or nervous, with normal mood and affect, normal behavior, normal judgment and thought content and actually denied any depression; in fact, treatment notes indicate his depression was controlled by his medication.

A month later, the claimant reported some depression but denied insomnia and suicidal ideation and insisted his depression and anxiety were "doable" and much improved from a year earlier. Moreover, he had a normal mood and affect, normal behavior, normal judgment and normal thought content. Mental status exam [at] the end of December 2012 was normal as well.

The end of January 2013, the claimant underwent a psychiatric evaluation where he reported his depression symptoms had been under reasonable control until three months earlier, when he suddenly became more depressive and isolative, with increasing auditory hallucinations. Mental status exam was generally normal but for a depressed mood and depressed and odd/child-like affect and some mild psychomotor retardation. But just a few weeks later, the claimant stated his auditory hallucinations were nearly completely resolved, and his morning anxiety generally resolved quickly. Mental status exam was normal but for a constricted affect. A month later, plaintiff stated he no longer experienced persistent or daily depression or anhedonia, his hallucinations had decreased, his appetite was stable and he felt hopeful. He was happy with his medication regimen and denied any side effects.

The claimant's mood remained generally stable without daily depression, without

8

a persistent low mood with some persistent but not disruptive auditory hallucinations. Again, he was overall happy with his medications, denying side effects, and exam was normal. Indeed, at the September 2013 appointment with Dr. Weinstein, the claimant did not even mention any depression symptoms.

(Tr. at 33-34, internal record citations omitted.)

The ALJ concluded that while plaintiff experienced some significant gastrointestinal issues and secondary complications such as IBD-induced arthritis and depression, the overall treatment record showed generally unremarkable examinations and essentially routine treatment that was generally successful in managing plaintiff's symptoms.

The claimant's arthritis, as well as his weight and GI symptoms, allows him to perform light work, alternating between sitting and standing as needed with occasional climbing of ramps and stairs, balancing, crouching, kneeling and crawling but precludes climbing ropes, ladders and scaffolding. His arthritis symptoms limit him to occasional handling and fingering with the left hand and his constellation of his physical symptoms require that he avoid more than occasional exposure to extremes in temperature and humidity and hazards. In addition, these symptoms plus his mental health symptoms limit him to routine tasks that allow him to be off task up to 10% of the work day but do not require fast-paced production or more than occasional interaction with the public.

(Tr. at 34.)

Based on this RFC, the ALJ determined at step four that plaintiff could not perform his past work as a machine operator and line worker. Finally, at step five, the ALJ concluded that plaintiff could perform other jobs as identified by the VE, including mail clerk and machine tender. (Tr. at 35.) The ALJ accordingly found plaintiff not disabled. (Tr. at 36.)

Plaintiff requested review by the Appeals Council (Tr. at 16-17), submitting a letter from Dr. Linscott taking issue with the ALJ's decision (Tr. at 678-81). The Appeals Council considered the additional evidence but concluded that it did not provide a basis for changing the ALJ's decision, denying plaintiff's request for review. (Tr. at 1-2.) This action followed.

9

## II. STANDARD OF REVIEW

When the Appeals Council denies review (as it did in this case), the ALJ's decision constitutes the final decision of the Commissioner of Social Security. <u>Moore v. Colvin</u>, 743 F.3d 1118, 1120 (7th Cir. 2014). The court reviews the ALJ's decision to ensure that it is supported by "substantial evidence," meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, <u>Minnick v. Colvin</u>, 775 F.3d 929, 935 (7th Cir. 2015), and applied the correct legal standards, <u>Bates v. Colvin</u>, 736 F.3d 1093, 1097 (7th Cir. 2013). Although the court will not re-weigh the evidence or substitute its judgment for the ALJ's, this does not mean that the court simply rubber-stamps the decision. <u>Minnick</u>, 775 F.3d at 935. The court must conduct a critical review of the record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision; the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues, <u>Scrogham v. Colvin</u>, 765 F.3d 685, 695 (7th Cir. 2014), or fails to confront contrary evidence and explain why that evidence was rejected, <u>Moore</u>, 743 F.3d at 1123. Finally, the ALJ's decision must be upheld, if at all, on the same basis articulated in the decision by the ALJ himself. <u>Hanson v. Colvin</u>, 760 F.3d 759, 762 (7th Cir. 2014).

## III. DISCUSSION

Plaintiff argues that the ALJ failed to evaluate the opinions of his treating physicians, Drs. Linscott and Harris, under the proper legal standards; failed to account for his moderate limitations in concentration, persistence, and pace ("CPP"); failed to properly evaluate credibility; and erred in relying on the VE's testimony at step five. I consider each contention in turn.

10

### A.    Treating Source Reports

Under the regulations, an ALJ must give "controlling weight" to a treating source's medical opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence.  20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 SSR LEXIS 9, at *4.  If the ALJ finds that a treating source's opinion does not meet the standard for controlling weight, he may not simply reject it; treating source opinions are still entitled to deference and must be weighed under the factors set forth in the regulations, SSR 96-2p, 1996 SSR LEXIS 9, at *9, including the length, nature, and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist.  20 C.F.R. § 404.1527(c).  In many cases, a treating physician's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.  SSR 96-2p, 1996 SSR LEXIS 9, at *9-10.  Whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision.  Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011).

#### 1.    Dr. Linscott

As indicated above, the ALJ declined to give Dr. Linscott's opinion "significant weight." (Tr. at 33.)  He did not discuss the controlling weight standard or specifically apply the regulatory factors for weighing medical source opinions.  Rather, he discounted Dr. Linscott's opinion because plaintiff was asymptomatic, with an unremarkable physical exam, on the day Dr. Linscott prepared the report, and at the time he prepared the report Dr. Linscott had not seen plaintiff for nearly 10 months.  (Tr. at 33.)  These are not "good reasons."  See Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011) ("An ALJ must offer 'good reasons' for discounting

11

the opinion of a treating physician.").  It is inappropriate to reject a treating doctor's opinion based on a single treatment note, particularly when the claimant suffers from impairments likely to produce fluctuating symptoms.  See, e.g., Scott, 647 F.3d at 740; Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008).[3]  Further, Dr. Linscott had treated plaintiff for about 20 years (Tr. at 531), allowing him to provide a significant "longitudinal picture" of plaintiff's condition, Scrogham, 765 F.3d at 696; it is hard to see how a 10 month gap – possibly due to plaintiff's insurance problems (see Tr. at 71, 486, indicating that plaintiff lost his insurance in mid-2012) – could overcome this two-decade treatment history.

Finally, the ALJ took specific issue with Dr. Linscott's opinions regarding unscheduled breaks and absences – both of which would, if accepted, preclude employment (Tr. at 98-100) – without considering the numerous work excuses Dr. Linscott provided over the last three years of plaintiff's employment identifying those very limitations.  (E.g., Tr. at 592, 600, 605, 609, 613, 618, 625.)  Plaintiff's treating gastroenterologist and rheumatologist provided similar work excuses and FMLA certifications during flare-ups, supporting Dr. Linscott's opinion that

---

[3]The Commissioner notes that the ALJ may discount a treating physician's opinion if it is internally inconsistent.  See, e.g., Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004).  However, the ALJ may not "cherry pick" from mixed results in order to demonstrate inconsistency.  See Scott, 647 F.3d at 740.  The ALJ is supposed to review a treating source report for consistency with the record as a whole.  20 C.F.R. § 404.1527(c)(4).  In her brief, the Commissioner cites other treatment records (some of which the ALJ discussed earlier in his decision) in which plaintiff's GI symptoms were noted to be under control.  However, the ALJ did not cite this evidence in discounting Dr. Linscott's report, and my review is limited to the reasons the ALJ provided.  See Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").  Moreover, the Seventh Circuit has held that an ALJ may not reject a treating source's report just because the doctor does not have detailed notes to back it up.  Herrmann v. Colvin, 772 F.3d 1110, 1111 (7th Cir. 2014).

12

plaintiff's conditions would cause good and bad days and regular absences. (E.g., Tr. at 646-49, 654, 656, 658-61, 666-69, 671-72.)

The Commissioner contends that records from prior to plaintiff's alleged onset date are not relevant. Courts have rejected that contention. E.g., Hamlin v. Barnhart, 365 F.3d 1208, 1222 n.15 (10th Cir. 2004) (citing 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1527(d); Groves v. Apfel, 148 F.3d 809, 810-11 (7th Cir. 1998); Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 193 (1st Cir. 1987)); see also Doherty v. Astrue, No. 11-cv-838, 2012 U.S. Dist. LEXIS 139207, at *15 (S.D. Ind. Sept. 27, 2012) ("The Seventh Circuit and other circuits have ruled that an ALJ must consider 'all' evidence in the administrative record and, in fact, pre-onset evidence may be particularly relevant to assessing a claimant's degenerative condition post-onset."). Here, the pre-onset records are particularly relevant because they suggest that plaintiff could not, due to absences and/or excessive breaks, sustain the full-time employment he had held for more than 20 years. The matter must be remanded for reconsideration of Dr. Linscott's opinion based on the record as a whole.[4]

### 2.    Dr. Harris

The ALJ also declined to give Dr. Harris's report "significant weight." (Tr. at 33.) In so ruling, the ALJ started with the same reasons he gave for discounting Dr. Linscott's opinion – at the time he prepared the report Dr. Harris had not seen plaintiff for three months, and his treatment notes from that day did not validate the restrictions. As discussed above, a treating source report must be evaluated based on the entire record, not a single note, and the ALJ

---

[4]The parties discuss Dr. Linscott's letter submitted to the Appeals Council, but my review is limited to the evidence that was before the ALJ. See Eads v. Sec'y of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993).

13

failed to explain why this modest gap cast doubt on the opinion of a doctor who had treated plaintiff for 15 months. (See Tr. at 542.)

Unlike with Dr. Linscott's report, however, the ALJ did go on to find that Dr. Harris's report conflicted with other evidence in the record, including treatment notes from after plaintiff's August 2012 hospitalization, which reported good mood and no further auditory hallucinations, as well as a normal mental status exam from December 2012. The ALJ acknowledged that in January 2013 plaintiff reported to his new psychiatrist, Dr. Jason Burns, that he had become depressed and isolative, but subsequent notes from February and March 2013 again noted improvement. The final notes from Dr. Burns in May and June 2013 reported generally stable mood, some persistent but not disruptive auditory hallucinations, and satisfaction with medications.[5] (Tr. at 33-34.)

Plaintiff faults the ALJ for not considering whether Dr. Harris's report was consistent with treatment notes prior to the August 2012 hospitalization. The Commissioner responds that the ALJ did discuss those records, which generally noted improvement with treatment, earlier in his decision. (Tr. at 28-29.) The ALJ did not rely on those records in rejecting Dr. Harris's report; in any event, the records reflect ups and downs in plaintiff's mental state during this time. Plaintiff first saw Dr. Harris on October 3, 2011, reporting auditory hallucinations (hearing his name called, his dead uncle speaking to him), depression (isolation, irritability, interrupted sleep, decreased energy and focus), and some paranoia. (Tr. at 481.) Dr. Harris diagnosed

_____

[5]The ALJ also noted that at his September 2013 appointment with Dr. Michael Weinstein, his new primary physician, plaintiff did not mention depressive symptoms. (Tr. at 34.) However, it does not appear that Dr. Weinstein conducted a mental status exam at that time. The notes discuss only physical problems. (Tr. at 674-75.)

14

major depressive disorder with psychotic features and a GAF score of 50[6] (Tr. at 484),

increasing Bupropion, starting Risperidone, and continuing Clonazepam[7] (Tr. at 485). On

November 2, 2011, plaintiff reported a "bearable mood." (Tr. at 480.) His hallucinations had

decreased but were still present. Dr. Harris increased Risperidone and started Trazodone.[8]

(Tr. at 480.) On November 30, 2011, plaintiff reported that his auditory hallucinations had

resolved and his sleep improved on Trazodone. Nevertheless, Dr. Harris increased Trazodone.

(Tr. at 479.) On January 12, 2012, plaintiff told Dr. Harris that his mood was "pretty good," his

hallucinations had resolved, and his sleep was better on Trazodone. (Tr. at 478.) However,

on June 13, 2012, plaintiff reported depressed mood, auditory hallucinations of hearing his

parents call his name, reduced energy, and passive suicidal ideation. Dr. Harris increased

Risperidone and started Zoloft.[9] (Tr. at 503.) On June 27, 2012, plaintiff reported that his

hallucinations were still present, with no change in his mood. Dr. Harris again increased

Risperidone. (Tr. at 504.) On July 25, 2012, plaintiff reported a reduction in his hallucinations

---

[6]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and his overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 51-60 reflect "moderate" symptoms, 41-50 "severe" symptoms, and 31-40 "some impairment in reality testing" or "major impairment in several areas." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

[7]Bupropion is used to treat major depressive disorder, http://www.drugs.com/bupropion.html; Risperidone is a anti-psychotic medicine used to treat schizophrenia, http://www.drugs.com/risperidone.html; and Clonazepam is used to treat seizure disorders or panic disorder, http://www.drugs.com/clonazepam.html.

[8]Trazodone is sometimes prescribed for sleep disorders combined with a depressive state. http://www.ncbi.nlm.nih.gov/pubmed/10459686.

[9]Zoloft is used to treat depression, obsessive-compulsive disorder, panic disorder, and anxiety disorders. http://www.drugs.com/zoloft.html.

15

but continued depressed mood with low energy, and Dr. Harris increased Zoloft. (Tr. at 505.) Finally, on August 21, 2012, plaintiff reported that he was afraid he would kill himself, and Dr. Harris directed plaintiff's father to remove the guns from the house and take plaintiff to the emergency room (Tr. at 506), after which he was admitted for three days (Tr. at 513-18).

As the ALJ noted, plaintiff did seem to do better in the four months after his August 2012 hospitalization. (Tr. at 520, 539, 548, 549.) However, the ALJ overlooked evidence of disability in Dr. Burns's later notes. Dr. Burns took over plaintiff's psychiatric care in January 2013. At the initial evaluation on January 21, 2013, plaintiff reported worsening symptoms, including anhedonia, amotivation, poor sleep, feelings of worthlessness and guilt, variable appetite, and tearfulness. He had also begun to experience auditory hallucinations again, this time vague mumblings of unknown voices. (Tr. at 584.) Dr. Burns noted that plaintiff gave a history of mood disturbance preceding psychotic symptoms, pointing toward major depressive disorder with psychosis. (Tr. at 586-87.) However, Dr. Burns also noted that plaintiff's affect ("odd/child-like"), relational history (always living with his parents, never away from home), and the presence of psychotic symptoms with mild depressive symptoms suggested the possibility of primary psychotic illness, perhaps schizoaffective disorder (depressed type) or schizophrenia. Dr. Burns diagnosed major depressive disorder with psychosis, rule out schizoaffective disorder, and rule out schizophrenia, with a GAF of 40. (Tr. at 587.) While Dr. Burns did note some improvement in plaintiff's condition over the following months (Tr. at 580-81, 577-78, 575-76), his final note from June 2013 still listed a GAF score of 45 (Tr. at 573). Scores below 50 do not support a conclusion that the person is "mentally capable of sustaining work." Campbell v. Astrue, 627 F.3d 299, 307 (7th Cir. 2010).

The Commissioner notes that the American Psychiatric Association recently

16

discontinued use of the GAF, citing "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 16 (5th ed. 2013). However, the Seventh Circuit continues to consider such evidence. <u>See</u> <u>Williams v. Colvin</u>, 757 F.3d 610, 613 (7th Cir. 2014) (discussing a score of 45, indicative of serious impairment); <u>see also</u> <u>Yurt v. Colvin</u>, 758 F.3d 850, 853 (7th Cir. 2014) (discussing GAF scores, which were still in use at the time of the examinations). While the ALJ need not determine the extent of a claimant's disability based on a single GAF score, <u>Denton v. Astrue</u>, 596 F.3d 419, 425 (7th Cir. 2010), neither may he ignore or discount evidence favorable to the claimant's position, including GAF scores suggesting a lower level of functioning than that captured by the ALJ's hypothetical and mental RFC. <u>Yurt</u>, 758 F.3d at 860 (citing <u>Bates</u>, 736 F.3d at 1100).

The matter must be remanded for reconsideration of Dr. Harris's report based on the entire record. In re-evaluating the treating source reports, the ALJ must follow the standards set forth in 20 C.F.R. § 404.1527(c) and SSR 96-2p.

## B. Concentration, Persistence, and Pace ("CPP")

In determining RFC and posing hypothetical questions to the VE, the ALJ must consider all limitations that arise from medically determinable impairments, including deficiencies in CPP. <u>Yurt</u>, 758 F.3d at 857; <u>O'Connor-Spinner v. Astrue</u>, 627 F.3d 614, 619 (7th Cir. 2010). The most effective way to ensure that the VE is fully apprised of the claimant's limitations is to include all of them directly in the hypothetical. <u>Id.</u> at 619. The Seventh Circuit has not adopted a per se requirement that the specific terminology "concentration, persistence, and pace" be used in the hypothetical in all cases. <u>Id.</u> For instance, the court has let stand hypothetical questions that employed alternative phrasing specifically excluding those tasks that someone

17

with the claimant's limitations would be unable to perform, e.g., a hypothetical restricting the claimant to low-stress work where his limitations were stress- or panic-related. Id. (citing Johansen v. Barnhart, 314 F.3d 283 (7th Cir. 2002)). In most cases, however, merely limiting the claimant to "simple, routine, repetitive" tasks will fail to account for limitations in CPP. Id. at 620.

In the present case, the ALJ found at step three that plaintiff had "moderate" difficulties in CPP. (Tr. at 24.) In the RFC, the ALJ limited plaintiff to routine tasks allowing him to be off-task up to 10% of the workday in addition to regular breaks, with no fast-paced production and no more than occasional interaction with the public (Tr. at 25); he included these same limitations in his question to the VE (Tr. at 97). In determining RFC, the ALJ gave weight to the opinion of the state agency psychological consultant (Tr. at 32),[10] who found plaintiff moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday without interruptions from psychological symptoms and perform at a consistent pace (Tr. at 131-32; see also Tr. at 116-17). As a basis for these limitations, the consultant explained: "Poor focus due to combined effects of physical health conditions, social stressors and mood d/o." (Tr. at 132.)

Plaintiff contends that, as in O'Connor-Spinner and Yurt, the ALJ omitted the various "moderate" limitations found by the state agency doctor. In those cases, however, the ALJ attempted to account for moderate CPP-related limitations identified by the consultants by

_____

[10]The ALJ did not specifically adopt the consultants' reports, finding that they deserved "some weight" and supported a finding of not disabled. (Tr. at 32.) The ALJ's findings on the Listings – mild restriction of activities of daily living; moderate difficulties in social functioning; moderate difficulties in CPP; and no episodes of decompensation (Tr. at 24) – did match the consultant's findings (Tr. at 128).

restricting the claimant to simple work and limited interaction with others. See 758 F.3d at 858-59; 627 F.3d at 620-21. In the present case, the RFC/hypothetical also allowed plaintiff to be off-task up to 10% of the workday, in addition to regular breaks, with no fast-paced production. See Zoephel v. Astrue, No. 12-C-726, 2013 U.S. Dist. LEXIS 14253 , at *38-39 (E.D. Wis. Feb. 1, 2013) (collecting cases distinguishing O'Connor-Spinner where the ALJ accounted for limitations in CPP with similar restrictions).

Plaintiff further argues that the ALJ failed to explain how he came up with the 10% off-task limitation and how it addressed his concentration problems. See Rapp v. Colvin, No. 12-cv-353, 2015 U.S. Dist. LEXIS 34106, at *13 (W.D. Wis. Mar. 19, 2015). In Rapp, the ALJ attempted to account for CPP deficiencies with a 10% off-task limitation, despite the absence of any medical evidence supporting it and without attempting to explain where it came from. Id. at *15-16. The court concluded that "given the ALJ's silence and the minimal record, it cannot be said that Rapp was any more or less likely to be off-task 10% of the day than being off-task for 50% of the day." Id. at *17.

There is medical support for the restriction in this record; as plaintiff acknowledges, Dr. Linscott specifically opined that plaintiff would be off-task 10% of the day.[11] (Tr. at 533.) The Commissioner contends that because no other doctor offered an opinion on time off task, it was reasonable for the ALJ to use 10%. However, the ALJ did not say that he got the figure from Dr. Linscott. As discussed above, the ALJ declined to give significant weight to Dr. Linscott's report, and there is no suggestion in the decision that the ALJ credited the 10% time-

---

[11]Plaintiff contends that Dr. Linscott based this on physical impairments alone, but the report discusses mental impairments as well (Tr. at 532-33), and the ALJ explained that the 10% figure he adopted was based on physical and mental symptoms (Tr. at 34).

19

off-task limitation while rejecting the rest of the report. Further, Dr. Harris also offered opinions on the issue. Specifically, he opined that plaintiff was "unable to meet competitive standards" regarding his ability to complete a normal workday without interruption from symptoms and perform at a consistent pace. (Tr. at 544.) The form explains that this means plaintiff would be "distracted from job activity" from 21-40% of the workday. (Tr. at 544.)

The case must be remanded so the ALJ can explain how the RFC accounts for plaintiff's limitations in CPP, including any limitations identified by the state agency consultants accepted by the ALJ. See Rapp, 2015 U.S. Dist. LEXIS 34106, at *19.

**C.     Credibility**

SSA rulings set forth a two-step process for evaluating the credibility of a claimant's statements about his symptoms. SSR 96-7p, 1996 SSR LEXIS 4, at *5. First, the ALJ must determine whether the claimant suffers from an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities. Id.

Second, if an underlying impairment that could reasonably be expected to produce the symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit his ability to do basic work activities. Id. at *5-6. At this step, the ALJ may not discount the claimant's statements just because they lack support in the objective medical evidence. E.g., Pierce v. Colvin, 739 F.3d 1046, 1049-50 (7th Cir. 2014). Rather, the ALJ must make a finding on the credibility of the claimant's statements based on the entire case record, considering the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage,

20

effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, 1996 SSR LEXIS 4, at *8.

The ALJ must then provide "specific reasons" for his credibility determination, supported by the evidence and articulated in the decision. Id. at *3. So long as the ALJ substantially complies with these requirements, the court will review a credibility determination deferentially, reversing only if it is "patently wrong." See, e.g., Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). However, where the credibility determination is based upon objective factors rather than subjective considerations, the court has greater freedom to review the ALJ's decision. Id.

Here, the ALJ found plaintiff's testimony "only partially credible" based on several inconsistencies in the record. (Tr. at 31.) First, the ALJ noted that plaintiff testified to disabling IBD symptoms, but he did not initially allege IBD as a severe impairment. (Tr. at 31.) The ALJ cherry picked from the reports to reach this conclusion. While plaintiff did not list Crohn's or irritable bowel in his November 1, 2011, disability report (Tr. at 238), he did list these impairments and the associated symptoms in his November 18, 2011 function report (Tr. at 251, 253); he also reported associated symptoms in a November 13, 2011 pain questionnaire (Tr. at 246). See also Yurt, 758 F.3d at 860 (noting that an impairment should not be disregarded just because it was omitted from function reports).

Second, the ALJ noted that plaintiff alleged a need for frequent bathroom breaks, but he did not carry a change of clothing with him when leaving home. (Tr. at 31.) This overlooks

21

plaintiff's testimony that he left home infrequently and for short durations (Tr. at 81), that he always carried with him extra bandages to catch discharge, and that he did have "accidents," including one just a few days before the hearing when he could not get to the bathroom in time (Tr. at 82).

Third, the ALJ found that the medical evidence did not support the alleged gastrointestinal symptoms but instead indicated that the symptoms were well managed on plaintiff's current medication regimen. (Tr. at 31.) The ALJ did cite a significant amount of medical evidence in support of this finding (Tr. at 31-32), and the Seventh Circuit has recognized that "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008). However, the ALJ overlooked the fact that at the time of exams at issue plaintiff was no longer working and thus no longer subject to the stress that exacerbated his symptoms. (See Tr. at 70, 92.) As discussed above, the ALJ failed to consider plaintiff's numerous work absences and need for breaks prior to the termination of his employment.

Fourth, the ALJ cited plaintiff's daily activities, including laundry, dishes, walking his dogs, preparing simple meals, playing on the computer, mowing the lawn, and going to the grocery store. (Tr. at 32.) Although it is appropriate for an ALJ to consider the claimant's daily activities when evaluating credibility, this must be done with care. Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013). This is so because the pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment often differ dramatically between home and office or factory or other place of paid work. Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).

The chores cited here are just the sort of minimal daily activities the Seventh Circuit has

22

found do not suggest an ability to work.  See, e.g., Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) ("While the ALJ did list Zurawski's daily activities, those activities are fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain."); Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) (finding that "minimal daily activities" such as cooking simple meals, vacuuming, grocery shopping three times a month, walking for exercise, and playing cards "do not establish that a person is capable of engaging in substantial physical activity").  The ALJ also failed to consider plaintiff's alleged limitations in performing these activities.  See Craft, 539 F.3d at 680 ("The ALJ ignored Craft's qualifications as to how he carried out those activities[.]").  For instance, plaintiff testified that he could do dishes for 15 minutes before he had to take a 15 minute break, and that he could type on the computer for 10 to 15 minutes before his hands started hurting.  (Tr. at 74.)  He reported that he tried to do laundry once per week, but pain and lack of motivation made this "quite a chore" (Tr. at 279), and that while he did take his dogs out, he mostly sat while they ran around (Tr. at 280). Finally, the ALJ offered no explanation as to how any of these chores undercut plaintiff's claims about his symptoms and limitations.  See Jelinek v. Astrue, 662 F.3d 805, 812 (7th Cir. 2011) ("ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence."); Shafer v. Colvin, No. 13-C-0929, 2014 U.S. Dist. LEXIS 61843, at *37 (E.D. Wis. May 5, 2014) ("[T]he ALJ simply provided a list of activities, without linking them to any of plaintiff's claimed restrictions[.]").[12]

---

[12]The ALJ extracted from Dr. Burns's June 2013 note an indication that plaintiff was "active" around the house.  (Tr. at 32.)  The note stated: "Decided Our Space 'not for me' but active around house."  (Tr. at 575.)  Our Space is a daytime facility providing services to adults experiencing mental illness.  http://www.ourspaceinc.org/.  It is unclear what being "active"

23

The matter must be remanded for re-evaluation of plaintiff's credibility under SSR 96-7p. The ALJ should also consider statements from plaintiff's father and former co-worker (Tr. at 303-04) under the standards set forth in SSR 06-3p, 2006 SSR LEXIS 5.

## D.    Step Five Determination

The Commissioner bears the step five burden of establishing that the claimant can perform other work that exists in significant numbers in the national economy. Overman v. Astrue, 546 F.3d 456, 464 (7th Cir. 2008). A VE's testimony can satisfy this burden, but only if it is reliable. Id.

Plaintiff cites recent Seventh Circuit decisions questioning the reliability of vocational testimony based on the Dictionary of Occupational Titles ("DOT"). See Voigt v. Colvin, 781 F.3d 871, 879 (7th Cir. 2015); Herrmann, 772 F.3d at 1112-14; Browning v. Colvin, 766 F.3d 702, 708-09 (7th Cir. 2014). He also contends that, according to the DOT, the mail clerk and machine tender jobs the VE identified require frequent use of the hands, contrary to the ALJ's RFC for occasional use. Finally, plaintiff argues that the VE improperly gave jobs existing in a three state region, rather than jobs in "reasonable proximity" to plaintiff's residence. See Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004) (Barrett I).

The Commissioner responds that because plaintiff failed to object to the vocational testimony at the hearing the ALJ was allowed to accept the VE's conclusions. See Liskowitz v. Astrue, 559 F.3d 736, 745-46 (7th Cir. 2009). The Commissioner further notes that the ALJ limited plaintiff to occasional use of his left (non-dominant) hand only, a limitation the VE

_____

meant in that context. The ALJ also cited plaintiff's father's testimony for the proposition that plaintiff engaged in various activities, including snow blowing and taking out the garbage, but he overlooked the father's testimony that plaintiff worked in short spurts due to pain and lack of concentration. (Tr. at 87-88.)

24

specifically considered in identifying numbers of jobs. (Tr. at 97-98.) Finally, the Commissioner notes that the law does not require identification of jobs in the immediate area where the claimant lives. 42 U.S.C. § 423(d)(2)(A); see also Barrett v. Barnhart, 368 F.3d 691, 691-92 (7th Cir. 2004) (explaining that the "reasonable proximity" language in Barrett I was not intended to alter the statutory standard).

Because the matter must be remanded for the reasons set forth above, I need not determine whether Voigt, Herrmann, and Browning require a reviewing court to consider these issues despite the absence of an objection before the agency (or whether any conflicts with the DOT were so obvious that the ALJ should have picked up on them even absent an objection, see Overman, 546 F.3d at 463). The parties will be free to litigate these issues on remand.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of July, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge

25